**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**LONNIE C. BURGESS and**
**DEBORAH E. BURGESS**                                          **PLAINTIFFS**

**v.**                          **CASE NO. 4:06-CV-00062 GTE**

**LARSON'S GROCERY OF OXFORD,**                          **DEFENDANT/**
**INC. d/b/a LARSON'S BIG STAR**                  **THIRD PARTY PLAINTIFF**

**v.**

**TI SUB GP, LLC; CLARKSVILLE**
**REFRIGERATED LINES, INC.;**
**CLARKSVILLE REFRIGERATED**
**LINES I LTD; and REFRIGERATED**
**TRANSPORT EXPRESS I, LP**                  **THIRD PARTY DEFENDANTS**

<u>**ORDER**</u>

Presently before the Court is Defendant/Third Party Plaintiff Larson's Grocery of Oxford,

Inc.'s ("Larson's) Motion for Partial Summary Judgment against Third Party Defendants

Refrigerated Transport Express I, L.P. ("RTX"). Plaintiffs allege in their Complaint that on

October 8, 2003, Mr. Burgess drove his truck and trailer to Larson's for the purpose of the

delivery of food products.  Plaintiffs also allege that there was no proper loading plate provided

by Larson's that would safely assist a delivery person in the delivery of food packages, crates and

boxes to the store.  Instead, Plaintiffs state that Larson's provided a heavy, metal docking plate

that was too heavy for one person to lift.

Plaintiffs allege that a Larson's employee was helping Mr. Burgess lift the metal docking

plate, but "suddenly and without warning to Mr. Burgess dropped his side of the heavy plate."

Plaintiffs state that Mr. Burgess could not hold the plate alone and it fell hard striking his left

foot and causing injuries and damages.  Plaintiffs assert that there was "absolutely no contributory negligence in the accident on the part of the Plaintiff."

Larson's then sued the Third Party Defendants alleging breach of contract for failure to provide indemnity and to procure general liability and automobile liability insurance covering Larson's for occurrences such as alleged by Mr. Burgess.

## I.  Background

Plaintiff Lonnie C. Burgess was an independent contractor owner-operator truck driver operating under an independent contractor agreement with Third Party Defendant Clarksville Refrigerated Lines I., Ltd. ("CRL") on October 8, 2003, the date of the alleged accident which is the basis of this lawsuit.[1]  At that time, Mr. Burgess was temporarily "loaned" as a driver to Third Party Defendant RTX, which is a subsidiary of CRL.[2]  RTX was a party to a product transportation agreement ("the Agreement") with AWG Acquisition, LLC as a dedicated carrier for the transportation and delivery of grocery products from the Memphis division warehouse to various retail grocery stores, including Defendant Larson's.[3]

Larson's was one of the retail owning members and capital stockholders of Associated Wholesale Grocers, Inc., a cooperative wholesaler of grocery and supermarket products, which was the parent company of AWG Acquisition, LLC (collectively "AWG").[4]  AWG Acquisition

---

[1]Third Party Plaintiff's Response to Third Party Defendant's Statement of Disputed Material Facts ("Response to Statement of Disputed Facts"), ¶ 1-2.

[2]Response to Statement of Disputed Facts, ¶ 3.

[3]Response to Statement of Disputed Facts, ¶ 4.

[4]Response to Statement of Disputed Facts, ¶ 5.

was created solely for the purpose of acquiring warehouse facilities and other property of

Fleming Foods out of a bankruptcy proceeding in 2003, including the warehouse in Southaven,

Mississippi, which was then transferred to Associated Wholesale Grocers, Inc.[5]

The Agreement provides in part:

2. Scope of Basic Transportation Services. At such times as it may be requested
to do so by AWG Acquisition in accordance with this Agreement, Carrier [RTX]
agrees to transport, load and unload AWG Acquisition Products (a) from such
locations as may be designated by AWG Acquisition from time-to-time to one or
more of the Stores (an "Outbound Trip")[.][6]
. . .

20. Indemnity. Carrier shall indemnify, protect, defend and hold harmless AWG
Acquisition, its stockholders, members, directors, officers, employees, agents,
subsidiaries and affiliated companies (and similar Individuals and entities of each)
(collectively, the AWG Acquisition Parties") from and against (and shall on
demand reimburse AWG Acquisition for) any and all losses, liabilities, claims,
demands, suits, causes of action, judgments, awards, damages (including, without
limitation, consequential, punitive or exemplary damages), costs and expenses
(including, without limitation, all attorneys' fees and other costs and expenses
incurred in defending any such claim or other matters or in asserting or enforcing
this indemnity obligation) arising out of or in connection with this Agreement or
the performance or nonperformance by Carrier [RTX] of its obligations under this
Agreement (collectively, "AWG Acquisition Losses"), including, without
limitation, any Losses for bodily or personal injury, death or property damage, that
arise out of, are connected with or are attributable to the performance or
nonperformance by Carrier [RTX] of the Services, acts or omissions of
employees, agents or contractors of Carrier [RTX], any vehicles or other
equipment used in connection with the Services, any breach or default by Carrier
[RTX] of any provision hereof or any Losses associated with obligations of
Carrier [RTX] which are not assumed by AWG Acquisition including, but limited
to, those obligations of Carrier [RTX] which are set forth in Section 17 above.

Likewise, AWG Acquisition shall indemnify, protect, defend and hold harmless
Carrier [RTX], the stockholders, members, directors, officers, employees, agents,
subsidiaries and affiliated companies (and similar individuals and entities of each)

---

[5]Response to Statement of Disputed Facts, ¶ 6.

[6]Exhibit 4, Product Transportation Agreement ¶ 2, Third Party Defendant's Motion for
Partial Summary Judgment ("Defendant's Motion").

(collectively, the "Carrier Parties") from and against (and shall on demand reimburse Carrier for) any and all losses, liabilities, claims, demands, suits, causes of action, judgments, awards, damages, costs and expenses (including, without limitation, all attorneys' fees and other costs and expenses incurred in defending any such claims or other matters or in asserting or enforcing this Indemnity obligation) arising out of the performance or nonperformance by AWG Acquisition of its obligations under this Agreement (collectively, "Carrier Losses"), including, without limitation, any Losses for bodily or personal injury, death or property damage, that arises out of, are connected with or are attributable to the acts or omissions of AWG Acquisition or any breach or default by AWG Acquisition of any provision hereof.[7]

21.  Insurance.  Carrier [RTX] shall carry and maintain throughout the term of this Agreement, at its sole cost and expense, with reliable and financially sound insurance companies . . . all insurance that is required by applicable law or that Carrier [RTX] deems necessary or appropriate plus, if not otherwise required, the following insurance coverage:

> . . .

> (c) General Liability Insurance (including contractual coverage) with a $15,000,000 combined limit per occurrence,

> (d) Automobile Liability Insurance to cover owned, hired and non-owned autos with a $15,000,000 limit per occurrence, and

. . .

Within five (5) days following execution of this Agreement, and before the performance of any Services, Carrier [RTX] shall:

> (a) Obtain from its insurers with respect to each insurance policy described in this Agreement endorsements:

> > (i) naming the AWG Acquisition Parties as additional named insureds,

> > (ii) providing waivers of subrogation against the AWG Acquisition Parties,

> > (iii) providing that all self-insured retentions and deductibles (which shall be subject to AWG Acquisition's approval) and the

---

[7]Exhibit 4, Product Transportation Agreement ¶ 20, Defendant's Motion.

premium costs of all such policies shall be for the sole account of Carrier [RTX] to the exclusion of the AWG Acquisition Parties;

(iv) providing that such policies are primary with respect to the AWG Acquisition Parties' insurance policies, regardless of any "excess" or "other insurance" clauses therein, and

(v) providing that cancellations of, or material changes to, such policies shall not become effective until fifteen (15) days after notice thereof has been delivered to AWG Acquisition; and

(b) Prior to the Commencement Date, and at least annually thereafter, delivering to AWG Acquisition certificates of insurance evidencing the coverage and endorsements described in this Agreement.

. . .

Carrier [RTX] shall insure that all independent contact drivers, sub contractors and agents are covered under carrier's insurance coverage as specified in this section.

Prior to allowing any independent contractor drivers to retain subcontractors, helpers or others in connection with any of the Services, Carrier [RTX] shall arrange for such drivers and such subcontractors to have proof of workers' compensation coverage, general liability insurance and automobile liability insurance. Carrier [RTX] shall make available to all independent contractor drivers an occupational accident protection plan with a $800,000 combined limit per occurrence.[8]

## II. Summary Judgment Standard

Summary judgment is appropriate only when, in reviewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, so that the dispute may be decided solely on legal grounds. Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

The inquiry performed is the threshold inquiry of determining whether there is a need for trial-- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

---

[8]Exhibit 4, Product Transportation Agreement ¶ 21, Defendant's Motion.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## III.  Motion for Partial Summary Judgment

### A.  Choice-of-Law

In this diversity case, the Court must apply the choice-of-law principles of Arkansas to determine which substantive law to apply. *See Cotton v. Commodore Exp., Inc.*, 459 F.3d 862 (8 th Cir. 2006). Both parties admit that the Agreement between RTX and AWG provides that the it "shall be governed by and construed in accordance with the laws of the State of Kansas (excluding its conflict of laws rules)." *See Cooper v. Cherokee Village Development Co.*, 236 Ark. 37, 364 S.W.2d 158 (1963) (upholding the parties' contractual choice-of-law provision

because it had "substantial connection with the agreement").  It is undisputed that AWG is a

Kansas limited liability company and that RTX is a Texas limited partnership.  Plaintiff is a

resident of Arkansas and the accident occurred in Mississippi.  Additionally, the recitals reflect

that RTX will provide services to AWG in connection with the "Memphis Division," which is

apparently located in Mississippi, but provides products to stores in Tennessee, Mississippi,

Oklahoma, Missouri, Texas, Louisiana, Alabama and Kentucky.  However, the parties have not

provided the Court with any facts regarding the negotiation or execution of the Agreement

between AWG and RTX.

However, the Court need not decide this issue.  As discussed below, whether Kansas,

Mississippi, Texas, or Arkansas law applies to the Agreement in this case, the indemnity

provision in the Agreement cannot be construed to indemnify Larson's against losses resulting

from its own negligent acts because such intention is not expressed in clear and unequivocal

terms and does not satisfy the express negligence doctrine.  Also, the Court is not in a position to

decide the additional issues raised on summary judgment because no determination of the

negligence of Larson's has been made, the record does not clearly demonstrate whether the

accident arose out of the acts or omissions or performance or nonperformance of RTX or

Larson's, and no determination of the status of the parties under the policies and whether the

accident at issue gives rise to coverage under the policies has been made.

**B.  Indemnity**

Larson's also argues that RTX is also liable under the indemnification paragraph

contained in the Agreement.  Larson's states that RTX agreed to indemnify AWG and its

members from liability arising out of RTX's performance of the contract, and AWG agreed to

indemnify RTX for losses or liabilities arising out of the performance of AWG of its duties under the contract.  Larson's argues that Plaintiff's claim arose out of RTX's performance of duties under the contract and involved bodily injury arising out of the obligations of RTX under the contract, attributable to the acts or omissions of contractors of RTX.  Additionally, Larson's argues that the claim was attributable to vehicles and other equipment used in connection with the services, as Plaintiff was allegedly using a docking plate to unload the grocery products from the trailer.

Larson's notes that in the correspondence between RTX's insurer and Larson's insurer, RTX's insurer stated that "no contractual coverage is afforded under either policy" to RTX "for the tort liability (negligence) claimed" against Larson's, "as the Indemnity provision in the Agreement is unenforceable."[9]  RTX's insurer explained that "Under Kansas law, the governing law under the Agreement, an indemnity provision will not indemnify an indemnitee against its own negligence where that provision does not clearly and unequivocally express such an intent," and in this case, the indemnity provision does not clearly and unequivocally express such an intent.[10]

RTX argues that the indemnity paragraph provides indemnity for acts or omissions of RTX or those related to RTX as defined in the Agreement.  RTX asserts that the Complaint upon which Larson's seeks indemnity specifically states that there was no contributory negligence on the part of the Plaintiff, even if the Court considers him an agent or contractor of RTX.  Instead, the Complaint alleges that only the negligence of Larson's caused Plaintiff's injuries.  RTX

---

[9]Exhibit 7, Correspondence, 4-5-2005 Letter, Defendant's Motion.

[10]Exhibit 7, Correspondence, 4-5-2005 Letter, Defendant's Motion.

8

further argues that the indemnity paragraph also provides for cross indemnity by AWG for the "acts or omissions" of AWG or "any breach or default by AWG" of any provision.  RTX asserts that the limited language and the cross indemnity negates any inference that the parties intended RTX to indemnify AWG for the losses arising out of the conduct of others or the losses arising out of the indemnitee's own negligence.

RTX states that regardless of whether Kansas, Mississippi, Texas, or Arkansas law applies, an agreement providing indemnity for one's own negligence is only allowed if the agreement to indemnify for one's own negligence is expressed in clear and unequivocal terms, or under Texas law, if it meets the express negligence doctrine.  *See Martin v. Sears, Robuck & Co.*, 24 F.3d 765 (5th Cir. 1994) ("Under Mississippi law, an indemnitee will be indemnified against its own negligence 'when the contract shows by clear and unequivocal language that this is the intention of the contracting parties.'") (quoting *Blain v. Sam Finley, Inc.*, 226 So.2d 742, 746 (Miss. 1969); *Shoup v. Higgins Rental Center, Inc.*, 991 F. Supp. 1265 (D. Kan. 1998) ("It is a general rule that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed thereto, and mere general broad and seemingly all-inclusive language in the indemnifying agreement is not sufficient to impose liability for the indemnitee's own negligence."); *Nabholz Const. Corp. V. Graham*, 319 Ark. 396, 892 S.W.2d 456 (1995) (holding that an indemnitor's intention to obligate itself to indemnify an indemnitee for the indemnitee's own negligence "must be expressed in clear and unequivocal terms and to the extent that no other meaning can be ascribed"); *Missouri Pac. R. Co. V. City of Topeka*, 213 Kan. 658, 518 P.2d 372 (1973) ("[W]here parties to an indemnity

9

agreement intend the indemnitor to indemnify the indemnitee against loss or liability caused by indemnitee's own negligence or activities, they should specifically and unambiguously so state in the agreement."); *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705 (Tex. 1987) (rejecting the clear and unequivocal test and adopting the express negligence doctrine, which provides "that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific term" and "the intent of the parties must be specifically stated within the four corners of the contract").  RTX states that the indemnity paragraph in the Agreement does not meet either standard.

Larson's cites to *CertainTeed Corp., et al. v. Teichmann*, 944 F. Supp. 1501 (D. Kan.1996), in support of its argument that the indemnification provision in the Agreement are unambiguous and enforceable.  However, as RTX argues, Article 10 of the construction contract in *CertainTeed* "required Teichmann to hold harmless CertainTeed 'against all claims, . . . [and] losses . . . arising out of or incident to' Teichmann's work *'regardless of whether or not such losses were caused in part by the negligence*' of CertainTeed."  *Id*. at 1507 (emphasis added). No such language appears in the indemnification provision in this case.  Furthermore, the inclusion of the cross indemnity provision weighs against the argument of Larson's.

The Court finds that the indemnity provision cannot be construed to indemnify Larson's against losses resulting from its own negligent acts because such intention is not expressed in clear and unequivocal terms and does not satisfy the express negligence doctrine.  Furthermore, after considering the language of the indemnity provision in favor of AWG/Larson's and the cross indemnity provision in favor of RTX, the Court finds that the question of whether Larson's

10

was negligent, and if so to what extent, must be determined before determining whether the indemnity provision applies, and if so, to what extent.

Additionally, Larson's argues that the indemnity provision contains broad language imparting a "more liberal concept of causation than 'proximate cause.'" *CertainTeed*, 944 F. Supp. at 1507.  In *CertainTeed*, the plaintiff, a Teichmann (Third Party Defendant) laborer, sustained injuries in a fall from a platform at CertainTeed's (Third Party Plaintiff) facility, and claimed that his injuries were the result of the negligence of CertainTeed and Precision in failing to exercise reasonable care in keeping CertainTeed's premises in a reasonably safe condition.  *Id.* at 1505-06.  Teichmann asserted that even if it was required to indemnify CertainTeed for its own acts of negligence, the plaintiff's injuries did not "arise out of" Teichmann's work on the project.  However, "[r]elying on the allegations in [the plaintiff's] complaint, Teichmann maintain[ed] that a negligently maintained guard rail on the mezzanine level of a large furnace at CertainTeed's facility caused [the plaintiff's] injuries, and not Teichmann's work on the construction project."  *Id.* at 1507.  Essentially, Teichmann argued that its actions were not the proximate cause of the plaintiff's injuries.  *Id.*  The Court concluded that the plaintiff's cause of action arose out of Teichmann's work at CertainTeed's facility, explaining that the plaintiff "was Teichmann's employee, and he was performing work on the construction project, pursuant to Teichmann's direction, at the time of his accident."  *Id.*

Larson's states that the injury claimed by Mr. Burgess, where a metal docking plate was dropped on his foot while he was in the process of unloading grocery products from a trailer, is included under several provisions in the Agreement.  Larson's asserts that the accident (1) "ar[ose] out of or in connection with . . . the performance . . . by Carrier [RTX] of its obligations

under this Agreement"; (2) "ar[ose] out of, [was] connected with or [was] attributable to the performance . . . by Carrier [RTX] of the Services"; (3) "ar[ose] out of, [was] connected with or [was] attributable to . . . acts or omissions of . . . contractors of Carrier [RTX]; and (4) "ar[ose] out of, [was] connected with or [was] attributable to . . . any vehicles or other equipment used in connection with the Services".  However, the Court notes that the indemnity provision also requires that AWG indemnify RTX against all losses and claims that (1) "ar[ose] out of the performance or nonperformance by AWG" of its obligations under the Agreement;  (2) "ar[ose] out of, [were] connected with or [were] attributable to the acts or omissions of AWG"; (3) "ar[ose] out of, [were] connected with or [were] attributable to . . . any breach or default by AWG" of any provision in the Agreement.  Based upon the summary judgment record, the Court is unable to determine whether the accident arose out of the acts or omissions or performance or nonperformance of RTX or Larson's.  A determination of the negligence of Larson's based upon the Complaint in this case should first be made.

Therefore, the Court finds that summary judgment on the indemnity provision is not appropriate.  A determination of the negligence of Larson's has not yet been made, and thus, the Court cannot definitively determine whether the indemnity provision is enforceable.  Furthermore, the record does not clearly demonstrate whether the accident arose out of the acts or omissions or performance or nonperformance of RTX or Larson's.

**C.  Insurance**

Larson's argues that RTX is liable for breach of contract for failing to provide insurance coverage to AWG.  Specifically, Larson's claims that RTX failed to provide Commercial General Liability Insurance and Automobile Liability Insurance.

The "Additional Insured" endorsement to the CGL policy states, "WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your operations or premises owned by or rented to you," and lists "Where required by written contract" under the Schedule.[11]  The "Waiver of Transfer of Rights of Recovery Against Others to Us" endorsement to the CGL policy, which also lists, "Where required by written contract" in the Schedule, states:

> The TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US
> Condition (Section IV - COMMERCIAL GENERAL LIABILITY
> CONDITIONS) is amended by the addition of the following:
>
> We waive any right of recovery we may have against the person or organization
> shown in the Schedule above because of payments we make for injury or damage
> arising out of your ongoing operations or "you work" done under a contract with
> that person or organization and included in the "products-completed operations
> hazard".  This waiver applies only to the person or organization shown in the
> Schedule above.[12]

The CGL policy provides under "Exclusions" that "This insurance does not apply to: . . . g. . .. 'Bodily injury' or 'property damage' arising out of the . . . use . . . of any . . . 'auto' . . . owned or operated by or rented or loaned to any insured.  Use includes operation and 'loading or unloading'."[13]  "Loading or unloading" is defined as follows:

> [T]he handling of property:
>
>> a.  After it is moved from the place where it is accepted for movement into
>> or onto an . . . "auto"; or
>>
>> b.  While it is in or on an . . . "auto"; or

---

[11]Exhibit 2, CGL Policy - Part II, Plaintiff's Response.

[12]Exhibit 2, CGL Policy - Part II, Plaintiff's Response.

[13]Exhibit 2, CGL Policy - Part II, Plaintiff's Response.

      c.  While it is being moved from an . . . "auto" to the place where it is
      finally delivered;

but "loading or unloading" does not include the movement of property by means
of a mechanical device, other than a hand truck, that is not attached to the . . .
"auto".[14]

The "Amendment Suits" endorsement to the CGL policy provides,

      A.  Exclusion b. of COVERAGE A BODILY INJURY AND PROPERTY
      DAMAGE LIABILITY (Section I Coverages) is replaced by the following:

         b.  Contractual Liability

            "Bodily injury" or "property damage" for which the insured is
            obligated to pay damages by reason of the assumption of liability
            in a contract or agreement.  This exclusion does not apply to
            liability for damages:

               (1) That the insured would have in the absence of the
               contract or agreement; or

               (2) Assumed in a contract or agreement that is an "insured
               contract" provided the "bodily injury" or "property
               damage" occurs subsequent to the execution of the contract
               or agreement.[15]

The "Liability Coverage" provision in the Auto policy states, "We will pay all sums an

'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which

this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or

use of a covered 'auto'."[16]  However, the policy contains an exclusion for "'Bodily injury' or

'property damage' resulting rom the handling of property" either (1) "Before it is moved from the

---

[14]Exhibit 2, CGL Policy - Part II, Plaintiff's Response.

[15]Exhibit 2, CGL Policy - Part II, Plaintiff's Response.

[16]Exhibit 3, Auto Policy - Part IX, Plaintiff's Response.

place where it is accepted by the 'insured' for movement into or onto the covered 'auto', or (2) After it is moved from the covered 'auto' to the place where it is finally delivered by the 'insured'.[17]

The "Designated Insured" endorsement to the Auto policy states, "Each person or organization shown in the Schedule is an 'insured' for Liability Coverage, but only to the extent that person or organization qualifies as an 'insured' under the Who Is An Insured Provision contained in Section II of the Coverage Form," and lists "Where required by written contract" under the Schedule.[18]   The Auto policy excludes from coverage "[l]iability assumed under any contract or agreement."[19]   However, the policy states that "this exclusion does not apply to liability for damages" either (1) "Assumed in a contract or agreement that is an 'insured contract' provided the 'bodily injury' or 'property damage' occurs subsequent to the execution of the contract or agreement," or (2) "That the 'insured' would have in the absence of the contract or agreement."[20]

Additionally, the "Additional Insured and Loss Payee" endorsement, which modifies the "Motor Carrier Coverage Form," includes "Any lessor of a leased auto as defined in Paragraph A" as an "Additional Insured (Lessor)."[21]   The Coverage provision states:

---

[17]Exhibit 3, Auto Policy - Part IX, Plaintiff's Response.

[18]Exhibit 3, Auto Policy - Part I, Plaintiff's Response.

[19]Exhibit 3, Auto Policy - Part IX, Plaintiff's Response.

[20]Exhibit 3, Auto Policy - Part IX, Plaintiff's Response.

[21]Exhibit 3, Auto Policy - Part VIII, Plaintiff's Response.

15

1.  Any "leased auto" designated or described in the Schedule will be considered a covered "auto" you own and not a covered "auto" you hire or borrow.  For a covered "auto" that isn't a "leased auto" Who Is An Insured is changed to include as an "insured" the lessor named in the Schedule.

2.  The coverages provided under this endorsement apply to any "leased auto" described in the Schedule until the expiration date shown in the Schedule, or when the lessor or his or her agent takes possession of the "leased auto", whichever occurs first.[22]

"Leased auto" is defined as "an 'auto' leased or rented to you, including any substitute, replacement or extra 'auto' needed to meet seasonal or other needs, under a leasing or rental agreement that requires you to provide direct primary insurance for the lessor."[23]

"Insured contract" under both policies is defined as follows:

That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."[24]

Larson's states, and RTX admits, that a request was made to RTX and its insurers on behalf of Larson's that copies of the policies providing the liability coverage referenced in the Agreement be provided and, in addition, tender was made on behalf of Larson's to accept the Plaintiff's claim under the hold harmless/indemnification provisions of the Agreement, and take over the handling of the matter to conclusion.[25]  Liability coverage to Larson's and tender of

---

[22]Exhibit 3, Auto Policy - Part VIII, Plaintiff's Response.

[23]Exhibit 3, Auto Policy - Part VIII, Plaintiff's Response.

[24]Exhibit 2, CGL Policy - Part II, Plaintiff's Response; Exhibit 3, Auto Policy - Part IX, Plaintiff's Response.

[25]Response to Statement of Disputed Facts, ¶ 11.

16

defense was denied, and copies of the policies were not provided until after institution of the litigation by Plaintiffs.[26]

In support of RTX's breach of contract claim, Larson's relies upon a letter from Liberty Mutual Group, the insurance company from whom RTX obtained its policies, to Mattei Insurance Services, Larson's insurer.  Specifically, RTX's insurer informed Larson's insurer that RTX is a named insured on RTX's Commercial General Liability policy ("CGL policy"), but that "[e]ven if [Larson's] qualifies as an additional insured" under RTX's CGL policy, "no coverage is afforded pursuant to exclusion g.," which "negates coverage for 'bodily injury' arising out of" the "loading or unloading" of an "auto" that was rented to RTX.[27]  RTX's insurer further informed Larson's insurer that RTX is also a named insured on a Motor Carrier policy ("Auto policy"), but that no coverage is afforded to Larson's under that policy because Larson's "does not qualify as an 'insured' under the policy" or an "additional insured" under the endorsement.[28] Larson's further argues that RTX should be liable for any damages of Larson's up to the amount of the policy described in Agreement.

Larson's also states that the CGL policy and Auto policy combined limits per occurrence are $2,000,000 each,[29] but that the contract requires a combined limit per occurrence of $15,000,000 on each policy.  Larson's also asserts that the CGL policy and the Auto policy do

---

[26]Response to Statement of Disputed Facts, ¶ 11.

[27]Exhibit 7, Correspondence, 4-5-2005 Letter, Defendant's Motion.

[28]Exhibit 7, Correspondence, 4-5-2005 Letter, Defendant's Motion.

[29]Exhibit 2, CGL Policy - Part I, Third Party Plaintiff's Response to Third Party Defendant's Motion for Partial Summary Judgment ("Plaintiff's Response"); Exhibit 3, Auto Policy - Part I, Plaintiff's Response.

not include AWG as a named insured, do not include waivers of subrogation against AWG, do not state that the self-insured retentions and deductibles and the premium costs of all policies are for the sole account of RTX, and are not primary as to AWG, as required under the Agreement.

RTX argues that the letter of an employee of Liberty Mutual constitutes hearsay, and therefore, should not be considered in deciding the motion.  RTX also argues that to the extent that Larson's is a member of a class of person's identified in the Agreement as "AWG Acquisition Parties," Larson's was entitled to be an additional named insured under the CGL policy and the Auto policy, by way of the endorsement, which provides RTX with additional insurance coverage "where required by written contract."  Thus, RTX argues that Larson's is a named additional insured on the policies.

However, RTX states that Larson's would have no greater rights than the rights afforded to an insured under the policy of insurance procured by or on behalf of RTX, and therefore, summary judgment should be denied absent a showing that under the terms of the Auto policy, Larson's would have been entitled to defense and indemnity under that policy of insurance. Additionally, RTX argues that even if Larson's is a named insured, it would not have been afforded coverage under the auto policy because the Complaint does not allege injury resulting from the "ownership, maintenance or use" of a covered auto, but from a metal docking plate, which cannot be considered a covered "auto."

Larson's argues that the fact that it "might conceivably have been an insured under an endorsement–which, according to RTX's insurer, is not the case–does not make Larson a named insured, just as the fact that RTX incidentally had other insurance coverage for itself under which Larson might have been insured does not satisfy the contractual requirements."

Finally, RTX states that Larson's has made no attempt to file suit against Liberty Mutual for a declaration of its rights as an additional insured.  Therefore, whether or not Larson's is entitled to a defense and indemnity from Liberty Mutual as an additional insured on the policies is beyond the scope of this Court's jurisdiction, as Liberty Mutual is not a party to this action. The Court agrees.  The Court cannot determine whether RTX breached the contract without a determination of the status of the parties under the policies and whether the accident at issue gives rise to coverage under the policies.  Summary judgment is not appropriate as to the claim of Larson's based upon the insurance provision of the Agreement.

Accordingly,

IT IS THEREFORE ORDERED that Defendant/Third Party Plaintiff's Motion for Partial Summary Judgment (Docket No. 46) be, and it is hereby, DENIED.

IT IS SO ORDERED this 25th day of June, 2007.

/s/Garnett Thomas Eisele_____
 UNITED STATES DISTRICT JUDGE